S. HAMILL *et al.*, Appellants, v. C. R. ENGLAND, Defendant; WM. MAGEE, Interpleader, Respondent.

St. Louis Court of Appeals, March 5, 1894.

1. **Fraudulent Conveyances:** PROOF OF FRAUD. The evidence in this cause is considered, and is *held* to so clearly establish fraud in the conveyance in controversy as to require the setting aside of a verdict sustaining that conveyance.

2. ———: DELEGATION OF POWERS TO GRANTEE. Held, *arguendo,* that a conveyance of all the assets of an insolvent debtor in payment of one creditor is fraudulent, if it is accompanied by the delegation of a power to the grantee to prefer other creditors out of any surplus of the assets over and above his own demand.

*Appeal from the Scotland Circuit Court.*—HON. BEN. E. TURNER, Judge.

REVERSED AND REMANDED.

*Edward Higbee* for appellants.

No brief filed for respondent.

BOND, J.—The appellants brought an attachment suit against defendant upon a note for $736.39. The writ of attachment was levied upon a stock of groceries as the property of defendant. The respondent, interpleader below, set up title to the goods. After a change of venue to Scotland county, there was a trial on the issues made by the interplea, and a verdict rendered for interpleader. After the motion for new trial was overruled an appeal was taken to this court.

On the trial the evidence tended to show that the interpleader, William Magee, was the father-in-law of defendant, C. R. England; that on the first of March, 1889, they became partners in a grocery and butcher business which continued until the sixth of August of that year, when the interpleader made a lumping sale of his interest in the firm to his partner, and took the note of the latter for $500, at six per cent. interest, in payment; that nothing was paid the interpleader on this note from the time of its date, August, 1889, up to October, 1890; that the interpleader then bought the stock of goods owned by defendant and agreed to take them at the invoice price, which amounted to about $776.89.

The interpleader stated, with reference to the surplus of this amount over and above his note for $500, that he was to pay two claims against his vendor, one for about $100 due Buck, Reiner & Co., the other for about $90 due Mr. Billick, and that there was no further agreement as to what should be done with any remainder of surplus after the payment of these claims; that he gave his own note for the first of these claims, and, to *indemnify* himself therefor, he received from his

vendor a transfer of a lot of book accounts; that he paid the other claim in cash; that he also at this time required a further transfer of book accounts to indemnify himself, but does not state whether he received the latter; that, if there was any remaining balance of the surplus in his hands, he doesn't recollect what agreement was made as to its disposition.

The interpleader also admitted that another creditor of his vendor traded out at his butcher shop a part of his claim. It also appeared that, during the whole time the interpleader held the $500 note against the son-in-law, he was in the habit of purchasing groceries from other dealers and paying cash therefor, and he at no time purchased any such articles from his son-in-law, who was then a dealer in family groceries.

The testimony of the son-in-law was that, when the trade was made with the interpleader, nothing whatever was said about what should be done with the surplus of the invoice over the note for $500; that, a few days after the trade, the interpleader gave his note for the amount owing by the son-in-law to Buck, Reiner & Co., and received as indemnity therefor a transfer of a large amount of book accounts.

The son-in-law on re-examination undertook to withdraw the admissions to the above effect, made by him on cross-examination, and to assert that, when the trade was made, it was agreed that the interpleader should pay the surplus to other creditors of him, the defendant. He also stated that he was heavily indebted at the time of the sale to his father-in-law, to wit, in the sum of $1,000 or $1,400, over and above what he owed the interpleader.

A number of other witnesses were examined, all of whose testimony tended to establish that the transaction between the interpleader and his son-in-law was entered into for the fraudulent purpose of hindering,

delaying and defrauding appellants and other creditors of the son-in-law.

In this case the trial court should have set aside the verdict against the appellants. The evidence of the interpleader and the defendant tended to prove that the transaction between them was not in good faith.

The theory insisted on by the interpleader in the court below, that he merely bought to save his own debt, agreeing at the time to pay the surplus of the goods purchased to two other creditors, is inconsistent with his own testimony. He admits that, as to the payment of the first, he demanded and received from his vendor an indemnity in assigned book accounts; and that he tried to get similar security for the second claim.

He admits that no agreement was made by him to pay any other than these two creditors; and that, as to any surplus left after paying them, he can not say how he was to pay it.

It is clear, from his admission on the trial, that he concealed to the use of his vendor at least as much of the surplus as was represented by the note which he gave one creditor, to indemnify himself against which he secured the book accounts. This was evidence of actual fraud.

That this was his purpose appears by what he *did* and by the wavering and uncertain evidence given by him as to agreement made when he bought the goods.

On the other hand, if this vague statement as to his agreement to pay the surplus to two creditors is to have a higher evidentiary force than what he did in carrying it out, then the transaction would still be fraudulent, if the fact was that he, as the creditor of an insolvent debtor, took all the assets of the latter in payment of his own claim with a delegated power to pre-

fer, out of any surplus of such assets, the claims of other creditors.

The reason on which this rule is based is that thereby he would be invested with a power of compulsion, inuring to the benefit of his grantor over the holders of other claims.. *Seger's Sons v. Thomas*, 107 Mo. 635; *Oliver Finnie Grocer Co. v. Miller*, 53 Mo. App. 107.

In the case at bar the admissions of the interpleader show that he compelled one creditor (Buck, Reiner & Co.) to accept a note for his claim, and another (Mr. Stanley) to "trade out" his at interpleader's butcher shop, thus exercising the very constraint reprobated by the law.

Again, the testimony of the defendant is little less than open admission of fraud in the sale in question. The testimony of all the other witnesses, and especially that of the attorney who was counsel in the matter, established that the object had in view was simply to defraud the appellant and other creditors, and that the plan adopted was hit upon after full consideration and rejection of another scheme for the same purpose.

This case must have been permitted to go to the jury on the *prima facie* case made for respondent by his possession when the goods were attached, and by some general statements made by him on the witness stand. The evidence, as a whole, convinces us that it was misunderstood by the jury, and that their verdict was biased by this misconception.

The result is that the judgment herein is reversed and the cause remanded.   All concur.